CHARLOTTE N. HUBBARD *vs.* C. A. PEAIRS
(and a companion case[1]).

Barnstable. March 10, 1987. — June 22, 1987.

Present: GRANT, KAPLAN, & KASS, JJ.

*Attorney at Law*, Settlement agreement. *Agency*, Scope of authority or employment. *Contract*, Compromise of will, Settlement agreement. *Will*, Compromise. *Judgment*, Implementing settlement negotiations. *Frauds, Statute of. Jv<sup>,</sup>lge.*

At a hearing in Probate Court proceedings in which the issues considered were the authority of an attorney to enter into a settlement agreement in compromise of a will and whether such agreement was binding on a party even though not in writing and thus not signed by the party, the judge's conclusion that the agreement was both authorized and binding was supported by the evidence. [376-378]

A settlement in compromise of a will was not, by virtue of G. L. c. 204, § 17, or, in the circumstances, by G. L. c: 259, § 1 (the Statute of Frauds), required to be written and signed by the parties in order to be binding on them. [378-379]

No prejudice appeared in the denial of leave for a party to depose a probate judge in order to record his participation in the settlement of a case before him, where no evidence on that issue was offered at a hearing later held to consider the validity of the settlement. [379]

No abuse of discretion appeared in a probate judge's declining to recuse himself upon the untimely request of one of the parties before him. [380]

PETITION for probate filed in the Barnstable Division of the Probate and Family Court Department on March 15, 1983.

CIVIL ACTION commenced in the Barnstable Division of the Probate and Family Court Department on July 5, 1983.

The cases were heard by *James M. Sweeney*, J.

*Jeffrey H. Hubbard* of Texas, for Charlotte N. Hubbard in the first case & *Charles F. Dodson* for her in the second case.

---

[1] Henry R. Strand, Jr. vs. The First National Bank of Boston and William F. Kehoe, special co-administrators; Crotched Mountain Foundation; and Charlotte Hubbard.

*Zachary R. Karol (Don E. Gorton, III*, with him) for The First National Bank of Boston.

*William F. Kehoe (Jacob M. Atwood* with him) for Henry R. Strand, Jr.

*Richard A. Howard (James A. G. Hamilton* with him) for Crotched Mountain Foundation & another.

KAPLAN, J. 1. Clifford D. Hanson died on February 14, 1983, leaving a will, executed by him on December 2, 1982, of which the features important here were a bequest of $100,000 to Dorothy E. Black, an employee and friend; a life income in the residue to Henry R. Strand, Jr., also an employee and friend; the remainder to Crotched Mountain Foundation; and the express exclusion of Charlotte N. Hubbard, the testator's sister (an heir in case of intestacy) from any benefit under the will. The will was offered for probate by Mr. C. A. Peairs, named as executor. Charlotte appeared and filed objections. So did Strand. On December 19, 1983, a probate judge allowed Charlotte's motion to frame jury issues regarding capacity and fraud or undue influence. Strand objected to the latter issue but the Appeals Court affirmed the probate order on December 27, 1984, 19 Mass. App. Ct. 1104 (1984), and the Supreme Judicial Court later denied further appellate review. 394 Mass. 1102 (1985). In this "estate suit," Mr. Gordon T. Walker was serving as local counsel for Charlotte; Charlotte's son, Mr. Jeffrey T. Hubbard, a Texas attorney, was admitted to practice pro hac vice, and was expected to lead in trying the case.

Meanwhile, on July 5, 1983, Strand filed suit against the parties named in note 1, seeking to establish that he was the owner, by reason of his surviving the testator, of securities kept in a safe deposit box to which he had had access together with the testator, and that he was similarly the owner of certain funds allegedly held in joint account with the testator. At least after November 14, 1984, it was clear that Mr. Walker was lead counsel for Charlotte in this "equity suit"; Jeffrey's application for admission pro hac vice had been denied in that case, but he had the court's permission to assist Mr. Walker.

After consolidated discovery in the two suits, the equity suit went to trial on Monday, December 3, 1984. On that day the

plaintiff, Strand, put in his case and the court reserved decision on motions to dismiss. Trial was to resume on December 5.

The attorneys for the parties in the two suits had been discussing the possibilities of an over-all settlement. Talk was apparently intensified during a week or more preceding December 3, and the conversations went into high gear on December 4. Jeffrey and his mother were in Houston. Communication with Jeffrey was by telephone.

Jeffrey received calls from Mr. Richard A. Howard, representing Crotched Mountain Foundation, Mr. Walker, and the trial judge during the interval from noon to 4:30 P.M. and in the evening around 7:30 P.M.. Charlotte, a woman in her seventies, was present when Jeffrey took the calls and he discussed with her their content.

Settlement was hung up for a time by Charlotte's demand (through Jeffrey) of a cash payment of $300,000. The compromise which succeeded — it may have been suggested by Mr. Howard — was that the estate, less the $100,000 passing to Dorothy Black, and less taxes, fees, and expenses, should be liquidated and divided 55% to Strand, 30% to Crotched Mountain Foundation, and 15% to Charlotte, with an "up front" payment to Charlotte of $50,000, payment to Strand of $728,000, and subsequent distributions to fulfil the agreed division. Besides this centerpiece of the settlement, there was agreement about the sale of antiques owned by the testator and the liquidation of the antique business, the sale of a house in Sandwich and occupancy of it by Strand and Black pending the sale, and about other matters. By the close of December 4, the lawsuits were considered settled, so that Charlotte then cancelled her intended trip from Houston to testify in the equity suit. Mr. Walker was to appear for her in court the following morning when settlement would be announced.

On the morning of December 5 the attorneys for the parties made known in open court that settlement had been reached covering both suits. At the judge's request, Mr. William F. Kehoe, serving as special co-administrator together with The First National Bank of Boston, dictated into the record the terms of the agreement as he understood them, to which the

judge added that he took the parties to agree that the court had the right to enter decrees in the two suits conforming to their agrecment, and if any party did not sign the written agreement (to be circulated), the court would not enter any decree without giving counsel a hearing on the form of the decree.

Mr. Kehoe on December 7 wrote to the parties about the settlement. This drew a letter from Jeffrey dated December 12, addressed to all, including the judge, protesting that there were a number of items which were materially at variance with representations made to him on December 4; and he concluded on Charlotte's behalf by rejecting the settlement and withdrawing any offer of settlement that might have been made on Charlotte's part. A draft of a formal agreement of settlement, dated December 26, appears of record. It was, of course, aborted.

Procedural steps were taken on Charlotte's behalf (Mr. Walker having now been replaced by other Boston counsel) that were intended to prevent the entry of a decree to carry out a settlement. At length, on January 28, 1985, The First National Bank of Boston, as special co-administrator, acted to resolve the impasse by moving the court to "hold an evidentiary hearing on the issues of Gordon T. Walker's authority to enter into the settlement agreement as outlined in open court on December 5, 1984 . . . and/or the ratification of the December 5 Agreement by Charlotte Hubbard."[2] The court allowed the motion and such a hearing, conducted in both suits, occurred on January 21, 1986. There was direct and deposition testimony by Charlotte and Mr. Walker. A transcript of the hearing is included in the present record. On March 7, 1986, the judge filed detailed findings of fact and conclusions of law, and on the same day he entered an order which states that the parties on December 5, 1984, entered into a binding agreement in full settlement of both actions; sets out the terms of the agreement; and (in effect) declares it to be enforceable. The

---

[2] "As reason therefor," the bank said the factual issues would be more properly resolved on the basis of testimony than on affidavits that had been filed by Charlotte and Jeffrey Hubbard.

terms of the order are summarized in the margin.[3] Charlotte alone appeals from the order; the other parties have filed a joint brief urging affirmance of the order.

2. The findings of fact are not shown to be clearly erroneous (Mass.R.Civ.P. 52[a], 365 Mass. 816 [1974]; *Palmer* v. *Palmer*, 23 Mass. App. Ct. 245, 249-250 [1986]) and we accept them. The story shapes up as follows.

By the close of December 4, a fairly comprehensive settlement had been agreed to by Charlotte or by Jeffery on her behalf. (She was following his advice fully.) The judge sets out carefully these agreed points.[4]

Mr. Kehoe, describing the settlement the following morning as he understood it, elaborated or rendered in somewhat greater detail a few of these points (as one might expect a lawyer to do),[5] and also added a few points not considered in the December 4 telephone conversations with Houston but which may well have been worked out by the attorneys on home grounds.[6]

---

[3] The Hanson will was reformed to read as follows: Black to receive $100,000; the net residue to pass 55% to Strand, 30% to Crotched Mountain Foundation, an 15% to Charlotte. C.A. Peairs named executor, but if he declined, The First National Bank of Boston to serve. Charlotte to receive an initial payment of $50,000; Strand, $728,000. Certain fees to be paid totalling $170,000. Personal family items identified by Charlotte and agreed upon by Strand and Crotched Mountain Foundation, to the extent found, to be delivered to Charlotte at estate expense. Executor to proceed with liquidation of inventory of antiques, with discretionary power to operate the business, including continuing the employment of Strand as manager during liquidation. The house to be placed on market for sale, Strand and Black being permitted to occupy for a year after executor's appointment. Barring of all claims by Strand, Crotched Mountain Foundation, and Charlotte against the estate.

[4] These are listed at Finding 30 and agreement is shown at Finding 32. Points not the subject of such agreement are listed at Finding 31 (at [c] the date shown should be December 31, 1986).

[5] For example, the Kehoe statement spelled out the successive steps in the distribution of the proceeds of liquidation of the residue.

[6] Thus, e.g., a provision for payment of legal fees to counsel for C.A. Peairs *as proponent of the will; a provision that disagreements regarding details of the administration of the estate were to be submitted to the judge for binding decision with waiver of appeal.

The written draft of agreement circulated thereafter carried some further elaborations and addenda surrounding, so to speak, the meat of the December 4 agreements.[7]

What the judge did in his order was to state only the substance of the settlement as Charlotte would have perceived it, in reason, on the night of December 4, free of subsequent emendations.[8] This we may consider to have been done out of considerations of fairness to Charlotte, to insure that she should not in any event be held to points to which she had not in truth agreed.

The facts in their setting supported the interpretation that it was not a condition of this basic settlement that the parties or any of them sign a writing; the writing would serve only as a memorial of an already binding agreement.[9]

Reverting to the terms of the motion calling for the evidentiary hearing, we may say that Mr. Walker's authority on December 5 certainly extended to the terms that Charlotte had agreed to (or "ratified"), which terms appeared in the judge's order. The net result was that Charlotte received treatment of which she could hardly complain, and no other party has complained.

3. There is no difficulty with the propositions underlying the judge's conclusions of law. (a) Although an attorney, merely by his having been retained in a litigation, does not possess the power to settle it, see *Precious* v. *O'Rouke,* 270 Mass. 305, 308 (1930), he may be so empowered by the client,

---

[7] Thus, e.g., a statement in more detail about the payment of the legacy to Dorothy Black; a provision recognizing Strand's ownership of items of personal property listed in a certain inventory.

[8] The order does exceed the December 4 agreements as outlined in Finding 30 by the inclusion of a provision for the return of the personal family items to Charlotte, but we take this to be a minor matter of common agreement, and advantageous to Charlotte.

[9] Note the judge's remark at the December 5 hearing, mentioned in our text above, that he would enter a decree despite a party's failure to sign a written settlement agreement, subject to a hearing as to form. The formal draft stated that the settlement would become effective upon its execution by the parties, but that was either in confident expectation of unanimous signature or in recognition that the draft now exceeded the Kehoe statement (and more so the Houston agreements).

expressly or by implication from conduct. See *Medford* v. *Corbett,* 302 Mass. 573, 574-575 (1939).[10] Here there was empowerment by the client; we need not inquire just how extensive it was on December 5, for it surely was broad enough to encompass the approval on Charlotte's behalf of what she had accepted through December 4, which in turn found its way into the judge's final order.

(b) The distinction is well understood between oral agreements which become effective only upon their reduction to executed writings, and those which are effective upon utterance, with later writings expected but not crucial to enforceability. See Restatement (Second) of Contracts § 27 (1979). The distinction is found among agreements settling litigation, as among other agreements, and there are recent examples of settlement agreements held effective although the party thereafter reneged and refused to execute a written instrument. See *Dominick* v. *Dominick,* 18 Mass. App. Ct. 85, 88-89 (1984); *Carver* v. *Waldman,* 21 Mass. App. Ct. 958, 959-960 (1986). As noted, we accept the judge's view based on the facts found that a binding agreement arose here, without need for a writing signed by Charlotte.[11]

4. *Various contentions.* (a) Charlotte contends there was a formal requirement of a writing signed by Charlotte and the others by reason of G. L. c. 204, § 17, regarding the compromise of wills. But it is clear law that the parties may settle their differences "simply by mutual agreement" without going under the statute. *Richmond* v. *Wohlberg,* 385 Mass. 290, 294-295 (1982). Where there is such a mutual agreement, there need be no statutory finding that it is "reasonable."

(b) In the same line, Charlotte attempts to invoke the Statute of Frauds about "a contract for the sale of lands" or "an agree-

---

[10] As to questions of admissions and stipulations by counsel in course of litigation, see *Savage* v. *Blanchard,* 148 Mass. 348, 349 (1889) (Holmes, J.); *Dalton* v. *Post Publishing Co.,* 328 Mass. 595, 599 (1952).

[11] See Findings 34 and 39.

In his third conclusion of law, the judge noted the court's power to enforce terms reasonably implied in a settlement, or fixed by law, or arising from a party's duty to act in good faith.

ment that is not to be performed within one year" (G. L. c. 259, § 1). However, the agreement reflected in the order herein which directed the executor to sell the house in Sandwich quite plainly did not fall within the former provision, and, as to the latter provision, Charlotte does not point to any agreement incapable of full performance within a year. See *Richard Tucker Associates, Inc.* v. *Smith,* 395 Mass. 648, 650 (1985). We should note that Charlotte in the proceedings below did not refer to the Statute of Frauds, ordinarily an affirmative defense, cf. Mass.R.Civ.P. 8(c), 365 Mass. 750 (1974), and admissions by Charlotte in her testimony regarding the agreement might be thought to serve in lieu of any writing that the statute could conceivably require. See *Dominick* v. *Dominick,* 18 Mass. App. Ct. at 93 n.7.

(c) Charlotte applied for leave to take the deposition of the judge to make a record of his participation in the settlement; as noted, the judge (without objection, so far as appears, from any party) was active in working out an agreement, and had spoken to Jeffrey by telephone. The reason for Charlotte's motion (dated January 4, 1985) was the possibility that the judge might enter an order, without further hearing, setting out the terms of a settlement, and on Charlotte's putative appeal from such an order she would want to be able to indicate what the judge might have testified to, had a hearing been held and the judge been called as a witness. Thus the motion was intended to serve as a kind of offer of proof to strengthen the record in case of an appeal. The motion was referred to another judge and was denied by him (February 15, 1985). Charlotte claims she was prejudiced by the denial. But, on the motion of the bank as special co-administrator, a hearing in fact was held on the question of the settlement, so the occasion for the motion disappeared. At that hearing Charlotte made no offer of proof with respect to the judge's participation in the talk of settlement, nor did she attempt to call him as a witness. (We do not suggest the offer or the testimony would have been appropriate or consequential.) The limited nature of the order finally entered, here under review, makes Charlotte's contention especially remote.

(d) Counsel for Charlotte chose the day of the hearing (January 21, 1986) as the time for serving and filing a motion to disqualify the judge. See the seven day notice requirement of Mass.R.Civ.P. 6(c), 365 Mass. 748 (1974), and Probate Court Rule 29 (1979). The judge did not act formally upon the motion but we shall take it to have been denied and the denial to be available for review in connection with the present appeal. Considering the whole record, we think it has not been shown that the judge abused his discretion in declining to recuse himself.

*Order affirmed.*