VICTOR THOMAS, administrator,[1] *vs.* MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY & another.[2]

No. 94-P-916.

Suffolk. September 11, 1995. - December 15, 1995.

Present: KASS, GILLERMAN, & LENK, JJ.

*Contract*, Settlement agreement, What constitutes, Offer and acceptance.
*Frauds, Statute of.*

In the circumstances of a claim by a plaintiff that the defendant had
breached an agreement to settle certain litigation, the judge incorrectly
ordered summary judgment for the defendant where the materials
before him did not support his conclusion that a signed document was a
condition precedent to an enforceable settlement agreement and where
there remained material disputes of fact with respect to whether the
plaintiff had unconditionally accepted the defendant's settlement offer.
[542-545]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 12, 1990.

The case was heard by *Hiller B. Zobel*, J., on a motion for
summary judgment.

*Louis A. Guidry* for the plaintiff.
*John J. Bonistalli* for the defendants.

KASS, J. In the context of an agreement to settle litigation,
the parties bring before us a variant of the old and recurring
question: have they by speech and acts agreed on all material
points so that the signing of a document would merely me-
morialize their agreement, or did their understanding require
that documents be signed before they would be bound to
their settlement? See *Hubbard* v. *Peairs*, 24 Mass. App. Ct.
372, 378 (1987); *Goren* v. *Royal Invs. Inc.*, 25 Mass. App.

---

[1] Of the estate of Shadie Thomas.
[2] Anthony Losanno.

Ct. 137, 140 & n.3 (1987); Restatement (Second) of Contracts § 27 (1979).

A judge of the Superior Court, who had presided over litigation control conferences at which he monitored and shepherded the parties' settlement negotiations, decided, on a defense motion for summary judgment, that signature was a precondition to a binding settlement contract and allowed the motion. Judgment thereafter was entered in favor of the defendant Massachusetts Bay Transportation Authority (the MBTA), thus relieving it of obligation to go through with the settlement. We think that the evidentiary submissions on summary judgment do not support the conclusion that the plaintiff's signature was the essential ingredient required for contract formation. Those same submissions disclose disputes about facts material to resolving whether the plaintiff had signified unconditional willingness to sign documents reflecting what the parties had agreed upon and whether the MBTA had unilaterally withdrawn an offer that had been accepted.

We summarize first those facts which the parties, on the basis of the summary judgment materials, do not dispute and, second, those which appear to us to be contested.

Shadie Thomas, on June 27, 1990, was seriously hurt in an MBTA bus accident. When bus doors in which she had been caught opened, she fell to the pavement and was then hit by the bus. For about seventeen months she was hospitalized at Massachusetts General Hospital. One of her legs was amputated, she became incompetent, and she spent the remainder of her life (she died May 5, 1992) in a nursing home in Falmouth.

On July 12, 1990, Shadie Thomas filed an action against the MBTA and the driver of the bus that struck her. The following September, Shadie Thomas was found incompetent. A brother, Victor Thomas (Thomas), and a sister, Evelyn Pisani, were appointed coguardians of Shadie Thomas's person and property, and Thomas was substituted for her as

plaintiff in the action against the MBTA.[3] During February, March, and April of 1992, there were intense settlement negotiations.

At a litigation control conference on February 7, 1992, counsel for the parties reported the case settled but Thomas said, "That's not my position, Your Honor." Thomas was dissatisfied with the over-all offer of $1,350,000, which then moved to $1,375,000. There was still, however, discontent on the part of Thomas as to the monthly amount that the structured payment component of the settlement would provide. After further pulling and tugging, the MBTA's lawyer, under a cover letter dated April 20, 1992, forwarded settlement documents to be signed by Thomas. Those papers cast the $1,375,000 settlement as follows: a lump sum of $80,000 to be paid forthwith; a further lump sum of $795,000 to be paid in July, 1992[4]; and $500,000 in the form of an annuity payable for life to Shadie Thomas, and, in any event, guaranteed to pay $7,715.79 per month for sixty months even should Shadie Thomas earlier die. That settlement formula had been approved by the MBTA's board of directors.

On April 30, 1992, a Thursday, there was another litigation control conference. Thomas raised a residual detail; he wished to check out the credit worthiness of the insurance company that was going to issue the annuity contract in favor of his sister. The Superior Court judge, who had previously suggested to Thomas that he was overreaching, thought this concern reasonable. "It's perfectly appropriate for you to want to be sure that the goose that lays the golden egg is in good health."

Counsel for the MBTA responded that Thomas's signature[5] to the settlement agreement and accompanying release

---

[3]The bus driver, Anthony Losanno, has no role in the appeal as the claim now pressed relates solely to the MBTA.

[4]An accompanying joint motion for approval of settlement expressed the lump sum payment schedule somewhat differently: $80,000 within sixty days of court approval of the settlement; $795,000 in July, 1992, after funding of the 1993 MBTA budget.

[5]The other guardian, Pisani, did not participate in the negotiations, and, as the case is presented, the parties seem to assume that the signature of

was critical and must be obtained by the close of business the following Wednesday, May 6, 1992, in order to enable the MBTA to lock in the quoted rate for the annuity agreed upon. The April 30 litigation control conference adjourned on the premises that all that was left to be done was for Thomas to bless the issuer of the annuity, Confederation Life Insurance and Annuity Company. That same day, lead counsel for the MBTA, Mr. Michael J. McCormack, sent (by telecopier and regular mail) to lead counsel for the plaintiff, Mr. Warren F. Fitzgerald, a letter saying:

> "I am writing to confirm that the offer, which was extended to the plaintiff (outlined in the Joint Settlement Agreement and the various Release Documents), will be withdrawn, if not accepted by the close of business on Wednesday, May 6, 1992."

On Friday, May 1, 1992, Thomas obtained the assurance he desired about the company that was to issue the annuity. On Monday morning, May 4, 1992, he called the office of his lawyer and spoke to a paralegal, Rebecca Holmes-Farley, to whom he communicated his readiness to sign the settlement agreement.

From that point on there is conflicting evidence about what was expressed to counsel for the MBTA. There is no conflict, however, that on the next day, May 5, 1992, Shadie Thomas unexpectedly died and the MBTA immediately withdrew its settlement offer, thus, producing the contract action now before us.[6]

We return to the disparate accounts of what occurred on May 4, 1992.

---

Thomas would effect the settlement agreement or that Pisani would follow his lead.

[6]After the MBTA withdrew its offer of settlement, the plaintiff amended his action to add breach of contract and G. L. c. 93A claims. The tort claim was tried to a jury which returned a verdict of $825,000. A judgment, inclusive of interest, was entered in the amount of $1,122,000. Thomas does not appeal from the judgment on his c. 93A claim.

The first account is that of Holmes-Farley, given in an affidavit and at a deposition. About 11 A.M. on May 4, she called Mr. McCormack's office and spoke to an associate of his, Ms. Elaine P. Belle. She told Ms. Belle that Thomas was ready to sign the settlement papers that day, and she asked Ms. Belle to send over a fresh and up-to-date set of papers for signature. They discussed a slightly different allocation of dollars between a medical reimbursement component and a contingency component but that did not alter the total dollars to be paid by the MBTA. They also discussed that the monthly annuity payment would decrease slightly because the commencement date of the annuity was now a month later than that contemplated in the previous set of settlement papers. Holmes-Farley called Ms. Belle twice more that day to inquire after the settlement papers, but failed to connect. Thomas arrived at his lawyer's office at 4:30 P.M. that day, May 4, 1992, to sign the settlement papers. Holmes-Farley then made a fourth call, ultimately talking to a paralegal. After 5 P.M., Holmes-Farley did connect with Ms. Belle and told her that Thomas and Pisani would be available at 10 A.M. the next morning to sign up. Ms. Belle expressed doubt that she could get the papers ready; she had many things on her desk. Maybe, Ms. Belle said, the signing would have to take place at the litigation control conference scheduled for May 6, 1992.

The second account of what occurred on May 4, also given in an affidavit and at a deposition, is that of Ms. Belle. As to the change in allocation of cash funds,[7] she was concerned that any diminution in the allocation for Massachusetts General Hospital might expose the MBTA to contingent liability to that institution. She considered the attempt to change allocations a change in the terms of the offer. Ms. Belle's impression was that Thomas was still endeavoring to tinker

---

[7]The allocation, arrived at as early as the February 7, 1992, litigation control conference was $410,000 to discharge a lien by Massachusetts General Hospital, $9,000 for additional medical expenses and accrued nursing home costs, $375,000 for attorney's fees, and $81,000 for a contingency fund to cover unaccounted for costs of care.

with the deal. She said, "[I]t was my feeling throughout this conversation [with Holmes-Farley] that there were other things discussed in the courthouse on April 30th [of] which I had no knowledge." Because she was in the dark about details of what had been discussed on April 30, and because she was awaiting details from the annuity company in California, she could not prepare the papers for signature the following morning, i.e., on May 5, 1992. While aware of the "drop dead" date of May 6, 1992, Ms. Belle "found it strange that after having an offer or having these negotiations going on for ninety days with everyone else ready to consummate and Mr. Thomas confronting us with one problem after another, now there was this incredible rush to get papers signed."[8]

As these summaries of the depositions of Holmes-Farley and Ms. Belle disclose, the Holmes-Farley version of events is that Thomas had accepted the offer unconditionally save for a detail that ought not to have mattered to the MBTA; the Belle version is one of significant details still unresolved. The question is whether this conflict is material to whether the MBTA was entitled to summary judgment. The motion (and later trial) judge thought not, on the ground that signing by the close of business on May 6 was a condition precedent to an enforceable settlement agreement. If signing of a document was not a condition precedent to an enforceable agreement, then the conflict as to whether the plaintiff had unambiguously communicated acceptance of the MBTA's offer, or had made a counter offer, was material, and the case was not ripe for summary judgment.

Assuming an unconditional acceptance of the MBTA's offer through Holmes-Farley's communications on May 4, 1992, that Thomas had satisfied himself as to the credit of the payor of the annuity and wanted to sign the settlement papers, was there, nevertheless, a condition that the papers in fact be signed before close of business May 6, 1995? In test-

---

[8]Ms. Belle expressed a wish to confirm things with the plaintiff's counsel, Mr. Fitzgerald, but he was understandably unavailable on May 4, 1992, because his wife gave birth to a baby that day.

ing whether signature was required for there to be an acceptance of the MBTA's offer, we consider the words used at the April 30, 1992, litigation control conference and in Mr. McCormack's letter to Mr. Fitzgerald of the same date, and the surrounding facts. *Wood* v. *Roy Lapidus, Inc.*, 10 Mass. App. Ct. 761, 764 (1980), and cases there cited.

Generally, quite emphatic words are necessary to create a condition precedent to the maturing of rights under a contract, or the forfeiture of rights. *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39, 46 (1991). *Commerce Ins. Co.* v. *Koch*, 25 Mass. App. Ct. 383, 385 (1988). That proposition should perhaps be applied more tentatively when solving questions of contract formation, but it offers some guidance. At the litigation control conference of April 30, 1992, Mr. McCormack, on behalf of his client, the MBTA, had said "what I need is the release signed by the guardian [Thomas] and the general manager to physically take the money, [and] give it to [a consultant] who then buys the annuity." After some further discussion, dealing solely with the concern of Thomas about the credit of the payor of the annuity, Mr. McCormack said: "I have been instructed by my client to inform Mr. Thomas that by the close of business Wednesday the 6th, to allow us to buy the annuity and to do the things we have to do to guarantee a rate that's been locked in two months ago, that I expect and my client expects a 'yes' or a 'no,' number one" and no changes in the "deal." Mr. McCormack's letter, written the same day, restated that the offer would be withdrawn, "if not accepted by the close of business on Wednesday, May 6, 1992."

From what Mr. McCormack said when he announced the "drop dead" date, from what he wrote when he confirmed it, and from the circumstance that Mr. McCormack's office controlled the paper work, we conclude that an unconditional "yes" was what was required to bind the settlement. The draft settlement documents that were forwarded to the plaintiff's counsel on April 20, 1992, had been reviewed and approved. What had been left open at the April 30, 1992, conference was approval of the annuity company, and that

approval was communicated on May 4, 1992. Assuming that this was done without an attempt by Thomas at that point to change the terms of settlement, it was then the mechanical task of the MBTA's counsel to prepare and execute a set of settlement documents that was consistent with the draft documents. The defendant could not reasonably demand that the plaintiff, before May 6, sign papers that it had not yet prepared and proffered. Indeed, Ms. Belle had said the annuity documents had to come from California. All parties knew that they were on a short time schedule — hence the urgency which Ms. Belle so curiously found incomprehensible. If Thomas, on May 4 communicated a willingness to sign the documents without changes — save for those that could be of no interest to the MBTA[9] — the settlement agreement would have been enforceable against the defendant.

Thomas had, in open court on April 30, announced that he agreed to the terms of the settlement and wished only to check out the credit of the annuity company. See *Correia* v. *DeSimone,* 34 Mass. App. Ct. 601, 602-603 (1993). Reciprocally, the defendant would be bound to the settlement by the receipt of Thomas's acceptance of the last unresolved settlement term, the identity of the annuity company. See also, as cases tending to give effect to detailed terms of settlement announced in open court, *Dominick* v. *Dominick,* 18 Mass. App. Ct. 85, 88-89 (1984); *Carver* v. *Waldman,* 21 Mass. App. Ct. 958, 959-960 (1986); *Hubbard* v. *Peairs,* 24 Mass. App. Ct. at 378.

If Thomas communicated unconditional acceptance on May 4, 1992, there is a further reason why the MBTA cannot revoke the offer of settlement it had left open until the close of business on May 6. A party may not force a breach of contract by withholding the means of performance. *Center Garment Co.* v. *United Refrigerator Co.,* 369 Mass. 633,

---

[9]A material fact about which the parties differ is whether the inquiry about shifting an amount from the medical expense fund to the contingency fund was of consequence to the MBTA in light of the obligation undertaken by the plaintiff under the settlement agreement to indemnify and hold harmless the MBTA against any claims or liens which could be asserted against the settlement.

637-638 (1976). Restatement (Second) of Contracts § 245 (1979). Similarly, in contract formation, if one party has put forth an offer for a certain time period, that same party may not prevent acceptance of the offer by denying the means (e.g., the documents) of acceptance if it controls those means. See *W & G Seaford Assocs.* v. *Eastern Shore Mkts., Inc.*, 714 F. Supp. 1336, 1340-1341 (D. Del. 1989). Restatement (Second) of Contracts § 224 (1979).

The MBTA attempts the argument that, insofar as made by speech, the settlement agreement is unenforceable under the Statute of Frauds (G. L. c. 259, § 1) because it is not to be performed within one year. Everything to be done by the MBTA, however, the payment of the lump sums and the purchase of the annuity, must, under the agreement, be done within sixty days — well within one year.

Counts I and II have been disposed of in the action that was tried to a jury. Dismissal of a fourth count in the complaint (under c. 93A) was not appealed and shall stand. The judgment in favor of the MBTA under count III (breach of contract on the settlement agreement) is reversed. The aspect of the case encompassed in count III is remanded to the Superior Court for further proceedings in accordance with this opinion.

*So ordered.*