Fremont-Smith, J.
This case, in which the plaintiff seeks to enforce an alleged settlement agreement with the MBTA, was tried jury-waived on October 8-10, 1996, after having been remanded to this court by the Appeals Court, which reversed the previous award of summary judgment to the MBTA. Thomas v. Massachusetts Bay Transportation Authority, 39 Mass.App.Ct. 537 (1995).
The Court finds, based upon all the credible evidence, that Shadie Thomas was seriously injured on June 27, 1990 when the bus doors in which she was caught, opened, following which she fell to the pavement and was hit by the bus. She was hospitalized for about 17 months, had one of her legs amputated, became incompetent, and spent the remainder of her life in a nursing home. A brother, Victor Thomas (“Victor”), was appointed co-guardian of her person and property together with another sister, and Victor was substituted for the plaintiff in an action Shadie had brought against the MBTA.
During February, March and April of 1992 there were intense settlement negotiations, some of which took place at “control conferences” convened by the trial judge (Zobel, J.). After an MBTA offer of $1,350,000 had been increased to $1,375,000, there was further discussion concerning the structured payment component of the settlement. It was agreed that that component would have a “present value” of $500,000 (comprising part of the total of the $1,375,000 settlement). By April 20, 1992, it had also been agreed that the structured part of the settlement would be in the form of an annuity payment for life to Shadie Thomas with a guaranteed payment of $7,715.79 per month for sixty months, with payments to be made to her estate if Shadie died earlier. This formula was approved by the MBTA Board of Directors and settlement documents reflecting the above were forwarded by the MBTA’s lawyer, under cover letter dated April 20, 1992, for signature by Victor and his sister. As the MBTA had reserved to itself the choice of the insurer which would provide the annuity, however, Victor raised an additional condition, namely that he obtain assurance as to the creditworthiness of the insurance company which would issue the annuity contract. At the April 30 litigation control conference, it was confirmed by the parties that all terms and conditions had been agreed upon,[1] subject only to Victor’s obtaining assurance as to the creditworthiness of the insurer of the annuity. On that same day, MBTA’s counsel sent, by fax and mail, a letter to Victor’s counsel, in which he notified Victor that the offer outlined in the joint settlement agreement and various release documents “will be withdrawn, if not accepted by the close of business on Wednesday, May 6, 1992.”
On May 1, 1992, Thomas obtained the assurances he desired about the company which would write the annuity, and on Monday, May 4, 1992 called his counsel’s office, to which he communicated his acceptance of the settlement and his readiness and availability to sign the settlement agreement and related papers that same day. Not being able to talk to his attorney (who was in attendance with his wife at the birth of a child), he asked a paralegal at his counsel’s office to contact MBTA’s counsel, which she did. The Court finds that, based upon all the credible evidence at trial, the paralegal told defendant’s counsel that Victor was ready to sign the settlement papers that day, and asked the MBTA’s counsel to send over an updated set of papers for signature, reflecting the revised amount of the monthly annuity payment discussed and agreed to at the control conference. Victor then went to his counsel’s office that afternoon (May 4) expecting to sign the papers. Although aware of the impending “drop dead” date of May 6, 1992 which MBTA’s counsel had communicated to plaintiff on April 30, defendant’s counsel (an associate of the MBTA’s lead counsel, Edward McCormick, who was unavailable) purported to be mystified as to why plaintiff was in such a rush, voiced doubt as to whether Victor was sincere in his expressed readiness to sign the documents, and indicated that she was very busy, so that she might not be able to forward the revised documents on that or on the following day (May 5). Instead, she stated that the settlement agreement might have to await execution at the next control conference scheduled before Judge Zobel for May 6, 1992. Far from suggesting that plaintiff might simply revise[2] and execute the previously-forwarded documents, defendant’s counsel indicated that she would have to have them revised by the structured settle *90 ment company (located out of state) and await delivery from them.
Although, in the course of the May 4 telephone conversations between the paralegal at plaintiff counsel’s office and defendant’s counsel, there had also been discussion of Victor’s desire for a change in allocation of the settlement proceeds between a reserve set up to cover hospital liens and one set up for other contingencies, these reserves were to be set up by plaintiffs counsel as an internal office bookkeeping matter to assist in his disbursement of the settlement funds to be received by plaintiffs counsel. The allocation of funds between various reserves was not a matter even alluded to in the written settlement agreement (which contained an “entire agreement” clause) or in the other settlement papers forwarded to defendant’s counsel on April 20. Defendant’s counsel herself agreed, moreover, in the course of the May 4 telephone conversations with plaintiffs counsel’s paralegal, that any allocation of funds between such reserves was a matter of internal bookkeeping of concern only to plaintiffs counsel and was not a material term or condition of the settlement papers previously forwarded to plaintiffs counsel.
The Court, therefore, finds that, on May 4, 1992, the plaintiff, having satisfied himself as to the creditworthiness of the proposed insurance company which would issue the annuity, effectively communicated to defendant his unambiguous and unqualified acceptance of all the essential terms and conditions of the agreement.
The additional question is whether the affixing of Victor and his sister’s signatures on the settlement documents was a condition precedent to the formation of a binding contract, so that Shadie’s death on May 5, before the contract could be signed, caused an impossibility of performance or changed circumstances not contemplated by the parties, such as to justify the defendant’s repudiation of the agreement at the May 6 control conference.
The Court concludes that it was not. Rather, based on all the credible evidence, this Court finds that an unconditional oral “yes” was all that was required to bind the settlement. See Thomas, supra, at 543.[3] The terms and conditions contained in the settlement agreement forwarded to the plaintiffs counsel on April 20 had been reviewed and approved, and all that had been left open as of the April 20 control conference was approved of the annuity company by Victor, which approval was communicated unambiguously on May 4. There was no evidence that Thomas, at that point, made any attempt to change the essential terms of the settlement, as contained in said documents, other than to see that the annuity monthly payments were revised as had been previously agreed. It was the understanding of all parties, reinforced by the telephone conversations on May 4, that the MBTA was to prepare the settlement documents (which, in view of the defendant’s May 6 deadline, the MBTA’s counsel and structured settlement firm could easily and should have previously had ready and available, on short notice, for execution by the plaintiff and his sister). In view of the Court’s finding that Victor unconditionally and unambiguously communicated his acceptance on May 4, 1992 and physically made himself available (and alerted his sister to be available) to execute the revised papers that day or the next, the settlement agreement was binding as of May 4, prior to Shadie’s death on May 5, i.e., prior to the event which defendant now claims rendered an executory contract impossible of performance or void because of changed circumstances. The Court further finds that even if there was, at one time, a condition precedent that the contract be executed before it was binding, not only was that requirement modified by the conditions of defendant’s April 30 “drop dead” letter and by its counsel’s statements at the April 30 control conference, but the defendant could not, in any event, absolve itself from liability by announcing a short deadline for acceptance and then failing to make the revised settlement papers available for plaintiffs signature when plaintiff was ready to sign. See Thomas, supra at 544-45.
ORDER
For the above reasons, it is ORDERED that judgment shall enter in favor of the plaintiff on Count III of the complaint. If the parties cannot agree upon the total amount of the judgment which should issue, including interest, counsel for the parties shall confer and schedule with the clerk a hearing for an assessment of damages. If the parties can agree on the total amount of judgment and interest which result from the above findings and rulings, the MBTA may do so while reserving, if it wishes, its objections to this Court’s findings and rulings on liability and preserving its right to appeal therefrom.

 It was recognized and agreed at the control conference that the amount of the monthly annuity payment, as set forth in the settlement papers, would be revised downward to an agreed amount, due to the delay in effectuating the annuity contract.

 The only revision required was the agreed-to reduction in the amount of the monthly annuity payment.

 This Court’s findings of fact after trial do not differ from the Appeals Court’s findings based on the paper record. As the Appeals Court noted, defendant’s counsel at the April 20 control conference stated to the Court and to Victor that “by the close of business on Wednesday the 6th, to allow us to buy the annuity and to do the things we have to do to guarantee a rate that’s been locked in two months ago, that I expect and my client expects a ‘yes’ or ‘no’ ’’ (Tr. 15). And the April 20, 1992 “drop dead" letter confirmed “that the offer which was extended to the plaintiff (outlined in the Joint Settlement Agreement and the Release Documents) will be withdrawn if not accepted by the close of business on Wednesday, May 6, 1992.” Neither of these ultimatums conditioned plaintiffs acceptance on a written communication of acceptance or on receipt of executed documents.