Greco, EJ.
The Pickering Wharf Realty Trust (“Pickering”) owns roughly two-thirds of the Pickering Wharf complex. It leased one of its condominium units to the defendant, Victoria Station Salem, Inc. (‘Victoria Station”), for use as a restaurant. The whole complex includes residences and a shopping center. In July of 2005, Pickering sought to evict Victoria Station for nonpayment of rent. More specifically, what was allegedly not paid was “additional rent” for “a proportion of the Shopping Center’s operating cost,” as more fully discussed below. The summary process complaint originally alleged that this additional rent was due for the period from January 1, 2000 through June, 2005. At this time, however, the dispute appears to focus only on the period from January, 2000 through September, 2003 (although the ledger accompanying the notice to quit seems to indicate otherwise).
The parties agreed to a “trial via submission to the Court” whereby each party would submit a “written trial memoranda including marked trial exhibits and any objections to opposing counsel’s trial exhibits.” The trial judge indicated that after the parties did so, he would decide the matter on the merits. Based on those submissions, the trial judge found that on May 1, 1997, Victoria Station agreed to lease from Pickering for twelve years “Unit B” located in the Grand Turk Building. The lease provided for the payment of a “Minimum Rent” and a “Percentage Rent,” payment of which is not at issue, along with various other amounts collectively termed as “Additional Rent.” One of these amounts, “Cost of Maintenance of Common Areas,” set out in Article IX, Section 9.01 of the lease is at issue here. Pursuant to this provision, beginning in the third year of the lease, Victoria Station was also to pay each month “a proportion of the Shopping Center’s operating cost,” calculated at 8.53% “of the total Common Area Charge.” At the time the lease was signed in 1997, it was estimated that this charge would be $1,600.00 per month. The Shopping Center’s “operating cost” was defined as
the total cost and expense incurred in operating and maintaining the common facilities ... actually used or available for use by Tenant and the employees, agents, servants, customers and other invitees of Tenant,... specifically including, without limitation, gardening and landscaping, the cost of public liability and property damage insurance, repairs, line painting, lighting, sanitary control, removal of snow, trash, rubbish, garbage and other refuse, depreciation on machinery and equipment used in such maintenance, the cost of personnel to implement such services, to direct parking, and to police the common facilities and fifteen (15%) percent of all the foregoing costs... to cover the Owner’s administrative and overhead costs (emphasis supplied).
*162 “Common facilities,” in turn, was defined as
all area space, equipment and special services provided by Ownerfor the common or joint use and benefit of the occupants of the Shopping Center, their employees, agents, servants, customers and other invitees, including without limitation parking areas, access roads, driveways, retaining walls, landscaped areas, truck serviceways or tunnels, loading docks, pedestrian malls, courts, stairs, ramps and sidewalks, comfort and first aid stations, washrooms and parcel pick-up stations (emphasis supplied).
The additional rent for the common areas was to be computed annually or quarterly, and was to be paid by the Victoria Station “promptly upon receipt of quarterly bills” from Pickering.
In March of 2003, after conducting an audit of its common area expenses, Pickering notified Victoria Station that a much larger amount was due as additional rent for the prior three years than the originally estimated $1,600.00. Victoria Station refused to pay on the grounds that Pickering had too broadly defined common expenses and common facilities, and that, in any event, the charges were excessive whether covered by the lease or not. Victoria Station represented that it was withholding payment for the additional amounts sought through 2003, but did pay the assessed amounts for subsequent years. As noted above, Pickering did not commence this eviction until July of 2005.
The trial judge agreed with Pickering’s interpretation of the lease, ruling that common area expenses “means all of those expenses attributable to running the entire Pickering Wharf complex” (emphasis in original). The judge rejected Victoria Station’s suggestion that it would not have to contribute to expenses related, for example, to the repair of an elevator in a different building of the complex, or to the repair of a roof or exterior painting of an adjacent building. The trial judge concluded that
[a] fair reading of the intent of the lease is that as a whole, the proper maintenance of the Pickering Wharf complex inures to the benefit of each individual tenant Maintaining the property in a safe, clean and attractive condition results in more persons being willing to come onto the site, and to patronize the businesses located there. The concept is one of a complete village within a city, allowing patrons to take advantage of all the amenities offered there for the potential benefit of all businesses and tenants, including Victoria Station. In one year, an elevator in another building might require repairs. In another year, the condition of the exterior paint at Victoria Station itself might need attention, or the pedestrian walkways in front of the restaurant might need repairs (emphasis in original).
Notwithstanding that interpretation of the lease, the trial judge ultimately found that Pickering lost any right to collect the additional rent for the years 2000, 2001 and 2002 by virtue of its delay in calculating and notifying Victoria Station of the amounts due. Thus, at this stage of the case, Pickering is happy with the trial judge’s expansive interpretation of common expenses, but unhappy with the judge’s finding that Victoria Station retains possession and escapes liability for the money past due. Indeed, Pickering contends that it was error for the judge even to deal with this waiver issue which it maintains was never raised by the parties. Victoria Station, on the other hand, is happy with retaining possession, but unhappy with the prospective application of the judge’s interpretation of common expenses.
1. Under Section 2.05 of the lease, the tenant’s share of the common expenses was deemed to be additional rent; and under Section 19.01, the “failure of [the] Tenant to pay any rental due” gave the owner/landlord an “immediate right of reentry.” The trial judge ruled, however, that because Pickering did not calculate the amount of additional rent sought and did not notify Victoria Station of that amount, *163 as contemplated by Section 9.01(c),[1] Pickering could “not be heard to complain that the tenant is in breach for failure to pay” in the past Accordingly, he concluded that Pickering was not entitled to possession. We do not agree.
Under Section 23.03 of the lease, no term would be deemed waived by the owner/ landlord unless such waiver was in writing. There is no evidence that Pickering waived in writing its right to the additional rent for Victoria Station’s share of the common expenses. We also do not view the provisions of Section 9.01 (c) as establishing a condition precedent to any obligation to pay the additional rent See Thomas v. Massachusetts Bay Transp. Auth., 39 Mass. App. Ct. 537 (1995), in which the Appeals Court noted that “ [generally, quite emphatic words are necessary to create a condition precedent to the maturing of rights under a contract, or the forfeiture of rights.” Id. at 543. Here, the lease is silent, much less emphatic, about what would happen if the calculation was not made and notice not given. Nor could Victoria Station rely on the equitable defense of laches. Such a defense would only exist “upon a factual finding that there has been unjustified, unreasonable, and prejudicial delay” in asserting a claim. Santagate v. Tower, 64 Mass. App. Ct. 324, 333 (2005). While Pickering’s delay in calculating the additional rent may well have been unjustified and unreasonable, there would be no basis for a finding of prejudice. That Victoria Station was required to pay attorney’s fees to defend this summary process action would not be deemed prejudice. Such fees would have been incurred even if the action had been brought earlier. On the other hand, Victoria Station remained on the premises during the whole period. It retained the use of the money it would have paid to Pickering. Since the additional rent would not be considered due until it was sought, interest would not have been accruing under Section 2.06 until March of 2003. Compare DeLorenzo v. Tzokos, 2001 Mass. App. Div. 179, 181 (tenant’s obligation to pay additional rent occasioned by an increase in real estate taxes was not wiped out by the landlord’s delay in notifying the tenant of the increase sought).
Finally, it is to no avail that Victoria Station was withholding and escrowing the additional rent. The provisions of G.L.c. 239, §8A apply only to “premises rented or leased for dwelling purposes.” Victoria Station is in the same position as the owner of a condominium unit who must pay the common expense assessments and not rely on “ [s] elf-help remedies.” See Blood v. Edgar’s Inc., 36 Mass. App. Ct. 402, 405-406 (1994). As the defendant in Blood, Victoria Station was “not without remedy or recourse.” Id. at 406. To avoid eviction, it could have paid the additional rent and thereafter sought “a judicial determination of the legality of the assessment.” Id. Accordingly, we conclude that Pickering may well have been entitled to possession, subject to the caveat at the end of this opinion. Because we so conclude, we need not address the duration of Victoria Station’s possession of the premises.
2. Even though the trial judge found that Pickering was not entitled to possession and that Victoria Station was not obligated to pay the additional rent for the period from 2000 to 2003, he addressed what would be considered common expenses for the years following 2003, effectively rendering declaratory relief in order to guide the parties in their future dealings. See G.L.c. 218, §19C. Since we have determined that Victoria Station was not absolved of its obligation to pay the additional rent for those prior years, we must review the correctness of file trial judge’s interpretation of common expenses.
What matters here is not how common expenses may have been defined as between Pickering and any other unit owners in the whole complex, but how they are defined as between Pickering and Victoria Station in their lease. The interpretation of the terms in that lease “is a question of law, not of fact” The Lexington Ins. Co. v. All Regiom Chemical Labs, Inc., 419 Mass. 712, 713 (1995). In reviewing the trial judge’s inteipretation of common expenses, we are mindful that “[t]he terms stated by the parties will be taken in their plain and ordinary sense unless otherwise indicated” in the lease, Rogañs v. *164 Albert, 431 Mass. 833, 835 (2000), and that “[a]s a general rule, a writing is construed against the author of ... [any] doubtful language ...ifthe circumstances surrounding its use and the ordinary meaning of the words do not indicate the intended meaning of the language.” Merrimack Valley Nat'l Bank v. Baird, 372 Mass. 721, 724 (1977).
The trial judge concluded that “[a] fair reading of the intent of the lease is that as a whole, the proper maintenance of the Pickering Wharf complex inures to the benefit of each individual tenant” (emphasis in original). Thus, he rejected Victoria Station’s argument that it would not have to contribute, for example, to the repair of an elevator which was wholly within another unit and was not used by the employees and patrons of the restaurant, or to the repair of a roof atop an adjacent building. It may be inferred from the record that the complex contains separate buildings with their own roofs, as opposed to all the units being in one building covered by a common roof. The trial judge noted further that “[t]he concept is one of a complete village within a city, allowing patrons to taire advantage of all the amenities offered there for the potential benefit of all businesses and tenants, including Victoria Station” (emphasis supplied).
While the parties were free to agree to such an arrangement, the words used in the lease belie such an intent. The “Shopping Center’s operating cost” and “Common Facilities” are defined in the same paragraph of the lease. As noted above, the former refers to costs related to facilities “actually used or available for use” by Victoria Station and “employees, agents, servants, customers and other invitees” of the restaurant. Victoria Station cannot use other businesses in the complex to conduct its own business. While the restaurant’s employees and customers may well be able to patronize other businesses in the complex, they certainly could not “use” the residences in the complex. The examples of items, albeit given “without limitation,” refer to expenses associated with the maintenance of the whole complex inuring to the benefit of all the occupants. More importantly, under the lease, “Common Facilities” encompasses areas, equipment and services provided “for the common or joint use and benefit" of the occupants. The two adjectives, “common” and “joint,” connote a shared use or benefit. Again, Victoria Station does not share space with the occupants of other units. It does not share the use of an elevator in another building. In some situations, a roof is shared, but in other situations, as is apparently the case with the restaurant, a roof may cover only one unit. Examples of such shared areas are set out in the lease; for example, parking lots, access roads and pedestrian malls. Although the lease expressly states that this list is also not meant to be complete, no examples are given of items wholly within another unit or solely used by another business or resident even though expenses associated with such items could be substantial. What the Supreme Judicial Court noted in the context of a dispute between a unit owner and a condominium association would seem to apply here; namely, that “[i]t does not seem either equitable or logical that townhouse unit owners should be required to pay a portion of the expenses for facilities from which they receive no benefit” Tosney v. Chelmsford Village Condominium Ass’n, 397 Mass. 683, 687 (1986). As also noted in Tosney, the parties could have agreed otherwise. Nothing, however, in the parties’ lease in this case, including the words used and the examples given, suggests, or gave Victoria Station notice, that it would have to pay for expenses related solely to another unit
Based on the above, the judgment of the trial court is vacated, and this matter is returned to the Salem Division of the District Court Department for further proceedings. Barring stipulations on the matter, there must be a trial to determine what amount, if any, of additional rent is due consistent with the above discussion. If the court finds that amounts are due and, therefore, finds for Pickering for possession, the issues of damages and of attorney’s fees under Section 19.03 of the lease would have to be addressed.
So ordered.

 Section 9.01(c) provided that amounts due “shall be paid by Tenant promptly upon receipt of quarterly bills... from Owner....”