van Gestel, J.
This matter is before the Court after a jury-waived trial on the merits. The Court’s findings of fact, rulings of law and an order for judgment follow. Mass.R.Civ.P. Rule 52(a). Nessralla v. Peck, 403 Mass. 757, 760 (1989).
FINDINGS OF FACT
The plaintiff Oceanair, Inc. (“Oceanair”) and the plaintiff Advance Brokers, Ltd. (“Advance”) are each Massachusetts corporations with principal places of business at the same site in Revere, Massachusetts. Both corporations, at all material times, were and are engaged in the business of providing Custom house brokerage and freight forwarding services.
The defendant David E. Katzman (“Katzman”) is an individual residing in Framingham, Massachusetts.
The defendant C.H. Powell Company (“CHP”) is a corporation with its principal place of business in Westwood, Massachusetts. CHP, like Oceanair and Advance, was and is engaged in the business of providing Custom house brokerage and freight forwarding services.
Prior to December 1996, Katzman was the sole shareholder and was an officer, director and employee of Advance. Advance was a company established by Katzman’s father, and Katzman himself had been affiliated with Advance for essentially his entire working life until December 1996.
On December 31, 1996, through a series of transactions, Katzman sold 97% of his stock in Advance to the principals of Oceanair: Edward S. Kaplan (“Kaplan”), Joseph J. Wyson (“Wyson”) and Harvey Waite, II (“Waite”). At the same time, Katzman became a 3% shareholder of Oceanair.
Katzman also signed an employment agreement (the “Employment Agreement”) with Oceanair on December 31, 1996. By the Employment Agreement, Katzman was employed “as Vice President of [Ocean-air] to render the following services: (a) day to day supervision and management of the Import Departments of [Oceanair] and Advance Brokers, Ltd . . . including preparation of annual budgets and profit and loss responsibility, reporting to the President of Oceanair, Inc. and its Board of Directors; and (b) such other duties and responsibilities that are consistent with his position and the duties and responsibilities of other statutory officers of [Oceanair] as may be determined by the Board of Directors.”
Among other things, the Employment Agreement contained non-disclosure, non-solicitation and non-competition covenants. It is only the non-competition portion of the Employment Agreement that is in issue here. In pertinent part those provisions read:
[Katzman] agrees that for a period of two years following . . . the termination of [his] employment with [Oceanair] . . . whether or not. . . termination is a breach of this agreement, [Katzman] shall not solicit or accept business from or provide custom house brokerage, freight forwarding or other transportation related services to any person, firm, company, corporation, business, or entity, which was or is a client or customer of [Oceanair] . . . while [Katzman] was employed by [Oceanair], whether such solicitation or acceptance of business or the provision of services is for [Katzman’s] own Business Entity or a Business Entity that employs him or a Business Entity with which [Katzman] is associated or interested in financially or otherwise; . . .
Katzman’s employment with Oceanair terminated at the end of March 1999. His last day on the payroll was March 31,1999. Consequently, the last day of the foregoing restrictions was March 31, 2001.
Certain disputes — not material to this case — arose between Katzman and Oceanair and its principals following the termination of Katzman’s employment. Those disputes were resolved amicably, and a settlement agreement (the “Settlement Agreement”) was executed by Katzman and the Oceanair group as of March 24, 2000. Among other things, the settlement agreement made specific reference to the December 31, 1996, Employment Agreement. Further, in a release portion of the Settlement Agreement designated Sec. 3.03, it reads:
. . . the release ... by Katzman . . . and the release of Katzman by [the Oceanair group] . . . does not release or waive any claims, rights or defenses . . . pursuant to or under (i) paragraphs 9, 10, 11, 12 and 13 . . . of the Employment Agreement, (ii) common law or statute pertaining to the protection of goodwill and trade secrets . . .
Paragraph 11 of the Employment Agreement is the non-competition covenant quoted in part above on pages 2 and 3 hereof.
A major customer of Advance, for many years before it was acquired by Oceanair, was a group of companies principally in the footwear and, to a lesser extent, the apparel business, these companies being referred to collectively by all of the parties to this case as “J. Baker.” J. Baker was actually an outgrowth of a company called Morse Shoe. Among the J. Baker subsidiaries or divisions were entities called: TCMB&T, Inc.; JBI, Inc.; JBI Apparel; and WGS Corp. Most of the J. Baker business, insofar as the parties to this suit are concerned, involved the importing of footwear and apparel by oceangoing ships, although there was some minor air freight involved as well. The business of J. Baker required extensive Custom house brokerage and freight forwarding services.
*416 Katzman, from as early as the time when Advance was servicing Morse Shoe, was the most senior person in charge of the J. Baker business. His principal contact at J. Baker was a woman in the import section of that group of companies named Christine Lanoue (“Lanoue”). Lanoue relied heavily on Katzman’s considerable expertise in the Custom house brokerage business, calling him her mentor in the subject.
Custom house brokerage business is highly regulated by the U.S. Customs Service, an agency in the Department of the Treasury. The Code of Federal Regulations, in Title 19, is replete with rules and regulations applicable to customs brokers and the customs brokerage business.
Katzman’s significant role with Lanoue and the J. Baker accounts continued after and throughout his employment at Oceanair. It ceased, however, upon his termination of employment with Oceanair at the end of March 1999. At about that time, Katzman and Kaplan, the latter being the president of Oceanair, visited with Lanoue at her office at J. Baker to report on the termination of Katzman’s employment. She was told that the separation was by mutual agreement and was assured that everything regarding the J. Baker business would be fine. She, however, was concerned.
About a week later, Lanoue and Katzman spoke again. She remembers Katzman trying to reassure her that everything would be fine. He was, she said, very quiet and did not seem to want to go into any details.
Lanoue was upset at the change and extremely disappointed. It did not make any sense to her from a business point of view. And she was losing her major contact at one of her principal Custom house brokerage firms. Oceanair did essentially all of the J. Baker Custom house brokerage work in the Northeast. The only other Custom house broker that J. Baker was using at the time was a company called Carmichael, which handled West Coast work and some Southern ports.
Katzman had no particular employment plans when he separated from Oceanair in April of 1999. Lanoue discussed his future with him in a general way. She told him about a possible interest she had in hiring him to come in-house at J. Baker to run an import division. Her concept was some kind of a separate company or division at J. Baker to provide import services and compliance-related services. The proposal, however, did not find acceptance at J. Baker and was dropped by Lanoue.
Soon thereafter, Peter Powell (“Powell”), the CEO of CHP, a long-time and substantial Custom house brokerage firm with 14 offices in the U.S., became aware that Katzman was possibly available. Communications between the two men began when Katzman asked Powell if Powell would serve as a reference for Katzman. The two men knew each other from industry functions and related matters, and they respected one another. Powell particularly liked Katzman’s expertise in Customs compliance matters and related technology and accounting. These conversations led to Katzman being hired by CHP in May of 1999.
Katzman was not hired by CHP to work in a sales function. Rather, he was to be a director of special projects, which principally evolved into internal compliance training and other related matters.
Before or at about the time of hiring Katzman, Powell was told by Katzman that he had some kind of agreement not to solicit accounts of Oceanair. Powell, however, never saw or asked for a copy of the agreement.
Katzman himself was vague in his understanding as to whether the non-competiton conditions of his Employment Agreement with Oceanair were in effect when he was hired by CHP. He assumed that the agreement was going to be torn up by Kaplan. Whatever Katzman’s thinking was in May of 1999, he does not challenge the execution of the Settlement Agreement in March of 2000 or the inclusion therein of references to the rights and defenses of the parties thereto with regard to the non-competition portions of the Employment Agreement.
Lanoue, at J. Baker, was also aware that Katzman had some kind of non-competition restrictions that prevented him from soliciting J. Baker’s business.
At some time early in 2000, Lanoue, who was not content with the services she was receiving from Oceanair, considered changing Customs brokers. When Katzman was handling the J. Baker account, Lanoue had had constant contact with him. After he left Oceanair, she only heard from Kaplan once or twice a year. She stated that the constant contact was important to her because she needed to know that her agents cared about her business and were “on the ball.” For her, the quality of service slipped after Katzman left Oceanair.
Lanoue attempted to convince Carmichael, her West Coast broker, to open a Boston office. This, however, did not occur. Also, J. Baker was considering becoming a “Foreign Trade Zone,” a special status under Customs regulations which would change significantly the way it handled its import business. It was at about that time that Lanoue contacted Katzman and asked whether CHP would consider taking on the J. Baker business. Katzman approached Powell, and Powell agreed to consider the possibility.
A meeting was held on April 4, 2000, between Katzman, Lanoue and Lou Sarnia, another J. Baker import person who worked under Lanoue. At that meeting, Lanoue discussed her situation. Among other things, she asked Katzman to have CHP present a menu of services and fees. She told Katzman that she was uncertain as to how she was going to proceed. She was considering her options, including self-brokering and Foreign Trade Zone status, as well as changing brokers.
*417 Katzman prepared a letter from CHP to J. Baker setting out certain assumptions and proposing certain pricing and methods by which CHP would be agreeable to handling the J. Baker account. This letter was approved by Powell and delivered to Lanoue on April 5, 2000.
Later, in May 2000, Lanoue began to seriously consider accepting one of the CHP options. She actually began the internal processes at J. Baker in anticipation of a change. Then, on July 6, 2000, CHP obtained the necessary powers of attorney from the several J. Baker entities that would enable CHP to begin acting as the Custom house broker for the J. Baker accounts. As a result, Oceanair lost the J. Baker business to CHP and effectively by the end of August 2000 was no longer servicing the J. Baker accounts.
In the changeover, Lanoue stated that she did so in part because she felt CHP was a better fit for her company operationally and from a relationship basis. She clearly was much more comfortable to be doing business again with a Custom house broker with which Katzman was involved.
This Court finds as a matter of fact that CHP, acting through Katzman, did not solicit the J. Baker business. Rather, Lanoue and J. Baker sought out CHP and asked for a menu of proposals from CHP. The decision to engage CHP was that of J. Baker. At the same time, this Court finds as a matter of fact that CHP did accept J. Baker’s business, with the direct assistance of Katzman, and CHP is a “Business Entity that employs” Katzman as those words are used in the Employment Agreement.
In the midst of the time when Lanoue was soliciting bids or options from CHP, she received, on April 13, 2000, an e-mail from Kaplan at Oceanair. The essence of the e-mail was contained in a report from James Dockstader (“Dockstader”), Oceanair’s Chief Financial Officer, to Kaplan, reporting that the J. Baker accounts were a financial loser. Dockstader stated in his report — and backed his statement up with a detailed summary and packet of calculations — that Oceanair was losing $4,000 to $5,000 a month on the accounts. He called the accounts very labor intensive and said that although the accounts produced a gross profit of about $138,000, after deducting over $90,000 in wages and benefits to maintain the accounts and overhead of $30,000 associated with the accounts, there was only a small profit of less than $20,000 per year. Further, Dockstader reported that due to advance payments by Oceanair for ocean freight charges on the J. Baker accounts, there were interest costs to sustain working capital that exceeded $75,000 per year. This led to a conclusion by Dockstader that the J. Baker business was causing Oceanair losses of about $55,000 per year.
While Lanoue did not accept Dockstader’s conclusions, she took the e-mail as a clear signal that Oceanair was not interested in the J. Baker business, at least without major changes. This was a significant turning point in Lanoue’s thinking on the issue of changing customs house brokers.
Dockstader prepared the e-mail for the express purpose of trying to convince J. Baker to change its method of dealing with large ocean freight charges. Oceanair was fronting those charges in amounts that aggregated nearly a million dollars a year by 1999 and 2000. Oceanair wanted to convince J. Baker to pay the ocean freight lines directly. For that reason, Dockstader did his calculations on the J. Baker accounts on a stand-alone basis. In other words, he did his calculations as if J. Baker were the only account of Ocean-air. This, he suggested, provided a distorted and inaccurate picture of profitability. He did concede, however, that all of his calculations were true and accurate.
At trial, Dockstader presented a different series of calculations that he said led him to the conclusion that the J. Baker accounts were actually profitable for Oceanair. His calculations relied, for the most part, on gross profits for calendar year 1998. Those gross profits were said to be as follows for the four J. Baker accounts: J. Baker, $77,536; Casual Male, $30,964; WSG, $6,593; and JBI Apparel, $5000. The JBI Apparel numbers were actually taken from information for a portion of 1999, not any part of 1998, and were rounded up because a full year’s numbers were not available. According to Dockstader, however, JBI Apparel was not a customer for the full year 1999. Including the somewhat suspect gross profit figures for JBI Apparel, Dockstader’s numbers aggregate $120,093 in gross profits.
Dockstader made no deduction from his gross profits figures for cost of labor, overhead or the value of the money paid out by Oceanair for J. Baker’s ocean freight charges. In the e-mail to Lanoue of April 13, 2000, Dockstader recited that these amounts were $90,000 for labor, $30,000 for overhead and $75,000 for interest at 8.5% on the fronted ocean freight payments.
No evidence was presented to the Court upon which it can make any findings as to whether the J. Baker business transferred to CHP has resulted in profits to CHP. Powell was unable to say whether there was a net profit from the business, and Katzman was not asked about that subject. These two men were the only CHP witnesses to testify.
Dockstader, in answer to a question by the Court, said that an Oceanair employee named Stephen Curley was a $30-per-hour employee. Curley worked full time on the J. Baker accounts while the business was at Oceanair. He worked a 40-hour week. Without benefits and other related matters, his pay alone would amount to $62,400 per year. Curley was the only Oceanair employee to work full time on the J. Baker accounts, but he was not the only employee to work on those accounts. Five or six other Oceanair *418 employees also worked from time to time on the J. Baker accounts.
RULINGS OF LAW
The complaint includes seven different counts, and yet the situation presented to the Court effectively comes down to three relatively basic issues: (1) did Katzman solicit the J. Baker business away from Oceanair to CHP in violation of the non-competition provision of Katzman’s Employment Agreement; (2) did CHP and Katzman accept the J. Baker business in violation of the non-competition provision of Katzman’s Employment Agreement; and (3) did Oceanair establish that it lost profits from either of the first two activities?
Counts I, II, III, IV and V are against Katzman. Count I charges him with breach of his Employment Agreement. Count II charges him with breach of the common law duty not to compete. Count III charges him with breach of fiduciary duty to Oceanair. Count IV charges him with interference with advantageous relationships. Count V charges him with violations of G.L.c. 93A.
Counts VI and VII are against CHP, charging it with interference with advantageous relationships and violation of G.L.c. 93A.
Although there were numerous exhibits and much evidence presented by all parties, the only business of Oceanair that is alleged to have been wrongfully moved from it to CHP through alleged improper actions by Katzman is the J. Baker business. The only agreement containing any language that might make that shift in business other than a perfectly innocent move in a free market is the non-competition portion of Katzman’s Employment Agreement with Oceanair. And the only damages for which evidence was presented were the claims of lost profits by Oceanair on the J. Baker business.
The Court acknowledges that, “(a]s a practical matter, the difference between accepting . . . business, on the one hand, and indirectly soliciting on the other, may be more metaphysical than real ...” Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 499 (1986). At the same time, here, unlike in Alexander & Alexander, the prohibiting language in the Employment Agreement does not include “indirectly” as a modifier of either “solicit” or “accept.” This Court was, in any event, able on the facts presented to draw a distinction between soliciting J. Baker’s business and accepting it that was neither abstruse nor transcendental.
This Court, in its findings of fact, found that Katzman did not solicit the Customs brokerage business of J. Baker to leave Oceanair and come over to CHP. “Solicitation” is defined as the act or an instance of requesting or seeking to obtain something. Black’s Law Dictionary, (7th ed.), p. 1398. Neither Katzman nor CHP did the requesting or seeking of the J. Baker business; they simply responded to Lanoue’s request for information. Thus, to the extent that the issue of solicitation is also a matter of law, this Court rules that Katzman did not solicit the Customs brokerage business of J. Baker to leave Oceanair and come over to CHP.
However, this Court, in its findings of fact, did find that Katzman participated in the acceptance, on behalf of CHP, of the Customs brokerage business of J. Baker. “Accept,” in one of its- many meanings, is to make an affirmative or favorable response to an offer. See, e.g., Webster’s Third New International Dictionary, p. 10. To the extent that the issue of acceptance is also a matter of law, this Court rules that Katzman did participate in the acceptance, on behalf of CHP, of the Customs brokerage business of J. Baker.
Whether, after CHP’s acceptance of the J. Baker business, Katzman himself provided any Custom house brokerage, freight forwarding or other transportation services to J. Baker, was not shown by any evidence provided at the trial.
Thus, the Court turns first to its analysis of whether any damages have been proved by Oceanair. The burden, of course, rests on Oceanair to prove its damages, not on Katzman or CHP to disprove them.
In a situation such as that presented here, a plaintiff may prove its damages by — as it attempted here— showing the profits it lost as a result of losing the J. Baker business to CHP, or, in the alternative, it may show the profits gained by Katzman or CHP. See, e.g., Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 169-71 (1979); National Merchandising Corp. v. Leyden, 370 Mass. 425, 430-31 (1976).
No evidence was presented to this Court that would permit it to make a ruling that damages by way of profits gained by Katzman or CHP have been shown. Nor has there been presented any evidence that would permit a finding of any other kind of damages sustained by Oceanair other than its own claimed lost profits. The Court, therefore, will now assay the proof of Oceanair’s lost profits.
First the Court must establish the temporal parameters within which the damages should be measured. In that regard it notes that J. Baker had no contract with Oceanair and was thereby free to take its business elsewhere at any time and for any reason of its own choice. Consequently, unless there was some breach of Katzman's Employment Agreement in connection with the move, no damages are warranted. The only action that this Court has focused on as possibly inappropriate is the acceptance by Katzman of the J. Baker business on behalf of CHP. That action, as a violation of the Employment Agreement, is tenuous at best. It must, in any event, be examined in the light of the temporal parameters of the Employment Agreement.
Katzman’s restriction on accepting the J. Baker business, by the language of the non-competition portion of the Employment Agreement, is “for a period of two years following . . . the termination of [his] employment with” Oceanair. The date of termination *419 was March 31, 1999. Thus, the two-year period expired on March 31, 2001. The business of J. Baker effectively moved from Oceanair to CHP in August 2000. So, the Court must look to see if any lost profits by Oceanair were shown during the eight-month period from August 2000 through March 2001.
The only testimonial and documentary evidence on this point was presented by James Dockstader, the Oceanair CFO. He presented two scenarios. First, at a time before the J. Baker business had moved from Oceanair to CHP and before any lawsuit was filed, Dockstader, in the April 13, 2000 e-mail, presented evidence to Christine Lanoue to the effect that Oceanair was losing $4,000 to $5,000 per month on the J. Baker accounts. His figures supporting this position, he affirmed before the Court at trial, were true and accurate.
Then, in the fall of 2001, as trial approached, Dockstader came up with a different theory, one that he claims shows that the J. Baker business was, in fact, profitable. This was the theory: — again backed up with figures — that showed gross profits for 1998 in the amount of $120,093.
The recovery of profits lost is a recognized recovery in situations such as that presented here. Damages for such lost profits, however, must be reduced by any direct expenses that would have been incurred in creating those profits. An element of uncertainty is accepted. See, e.g., Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc., 14 Mass.App.Ct. 396, 426 (1982). But the evidence must be such as would show a reasonably ascertainable monetary value. BBF, Inc. v. Germanium Power Devices Corp., 13 Mass.App.Ct. 166, 176-77 (1982). In other words, the claimed profits must not be “so uncertain or contingent as to be incapable of reasonable proof.” Knightsbridge Mktg. Services, Inc. v. Promociones Y Proyectos, SA., 728 F.2d 572, 575 (1st Cir. 1984).
Here, to this Court, there are glaring gaps in Dockstader’s calculations. First, he used as a base calendar year 1998, the largest gross income year for J. Baker with Oceanair, despite the fact that the business did not move on until August of 2000. There was no evidence that any of J. Baker’s customs brokerage business was handled in the Northeast by anyone — particularly Katzman or CHP — other than Oceanair up until August of 2000.
Much more significantly, Dockstader did not reduce the gross profit figure by any charges for labor, overhead or interest. In short, there was no showing of what he considered to be the net profit amount even for 1998. There was clear evidence, however, coming directly from Dockstader himself that these three items wholly consumed the gross profits on the J. Baker accounts for 1998.
First, with regard to labor, the J. Baker accounts were said to be labor intensive. One employee, Stephen Curley, worked full time on the J. Baker business. He was described by Dockstader as a $30-per-hour employee. In the findings above, the Court thereby calculated the cost in wages for Curley alone to be $62,400, before benefits. Additionally, other employees worked part time on the J. Baker accounts. Although the number of hours for those employees or their hourly rates were not presented, Dockstader himself told Lanoue in the April 13 e-mail that Oceanair’s costs for wages and benefits on the J. Baker accounts were $90,000 per year. This seems credible, although perhaps on the low side. Deducting that $90,000 from the $120,093 gross profit figure leaves only $30,093.
Then there is the matter of interest. This is the amount lost by Oceanair directly attributable to its fronting the payment of J. Baker’s ocean freight charges. "Interest is compensation for the deprivation of the use of principal.” Plasko v. Orser, 373 Mass. 40, 43 (1977). See also Conway v. Electro Switch Corp., 402 Mass. 385, 390 (1988). It matters not that Oceanair may not itself have had to borrow the money it used to front these charges. The fact cannot be escaped that it was deprived of the use of that money, wherever it came from, for the period that it was used for J. Baker’s benefit. Nor was there any evidence presented that Oceanair charged J. Baker anything for making these freight-charge advances; indeed it was quite to the contrary, with Oceanair annually imploring J. Baker to pay these charges directly.
Dockstader told Lanoue — again in the April 13, 2000, e-mail — that these interest amounts aggregated about $75,000 per year. Another witness, a certified public accountant called by Katzman, did calculations showing these interest rates to be something in between $40,000 and $75,000 per year, depending upon whether the average length of time the money was outstanding was as low as 12.5 days per month or as high as the 22 days suggested by Dockstader. Both Dockstader and the accountant agreed that the use of an 8.5% interest rate was appropriate. Thus, deducting either $40,000 or $75,000 from the remaining $30,093 gross profits results in a net loss of either $9,907 or $44,907 for Oceanair on the J. Baker accounts in 1998.
Lastly, there is the question of overhead. Again in the April 13, 2000, e-mail, Dockstader came up with a number of $30,000 for overhead attributable to the J. Baker business. He affirmed the accuracy of that number at trial. If it too is deducted from the J. Baker gross profits, the net losses to Oceanair drop further to $39,907 or $79,907.
Dockstader suggested that there should be no deduction for general overhead because there were no savings to Oceanair by the loss of the J. Baker business. The rent remained the same, no employees were laid off, the computers were kept, and the utility bills did not differ. But this Court — reasonably, it believes — can, and does, infer that these items did not just remain idle or unused after J. Baker took its business to CHP. They undoubtedly were utilized by Oceanair to service others of its customers. There was, therefore, a gain to Oceanair to that extent, or at least to part of that extent.
*420 Lost profits fall into a category of relief called special damages. They are damages that cannot reasonably be prevented and arise naturally from the breach. See, e.g., Delano Growers' Co-op. Winery v. Supreme Wine Co., 393 Mass. 666, 679-80 (1985); Sarkesian v. Cedric Chase Photographic Labs, Inc., 324 Mass. 620, 622-23 (1949).
Each of the counts or claims against Katzman and against CHP requires as an element of proof by the claimant of damages of some sort. See, e.g., United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815-16 (1990); Barden Cream & Milk Co. v. Mooney, 305 Mass. 545, 546-47 (1940); Adcom Products, Inc. v. Konica Business Mach. U.S.A., Inc., 41 Mass.App.Ct. 101, 104 (1996); Halper v. Demeter, 34 Mass.App.Ct. 299, 303-04 (1993).
Because of the failure of proof of lost profits and the fact that no other evidence of damages was proffered, damages are left to speculation and, therefore, judgment should enter for both defendants.
Further, this case rests almost totally upon Katzman’s non-competition obligations. In the absence of those obligations, there is nothing here but ordinary competition. This Court has serious doubt, however, as to whether the mere acceptance of the J. Baker business by CHP constitutes a breach by Katzman, even though Katzman participated in facilitating that acceptance. If there was no breach by Katzman, there certainly was no violation by CHP, upon which no non-competition bars were imposed.
Employee covenants not to compete generally are enforceable only to the
extent that they are necessary to protect the legitimate business interests of the employer. Novelty Bias Binding Co. v. Shevrin, [342 Mass. 714, 716 (1961)]. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with his customers. See All Stainless, Inc. v. Colby, [364 Mass. 773, 779-80 (1974)]. Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. Richmond Bros, Inc. v. Westinghouse Bdcst. Co., Inc., 357 Mass. 106, 111 (1970).
Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974).
Contracts like that in issue here, “are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood.” Sentry Ins. v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982).
The consequence of every covenant not to compete, however, is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable.
Marine Contractors Co., Inc., supra, 365 Mass. at 289.
At the same time, if Katzman did not solicit the J. Baker business, as this Court has found and ruled, then all he did, at most, was■ participate in the response to J. Baker’s request for information, and then participate in subsequent discussions that ended up with CHP accepting J. Baker’s business. Can it be said that more was in play than ordinary competition? If not, and this Court thinks not, then the non-Gompetition part of Katzman’s Employment Agreement that prohibits the acceptance of business is unenforceable as a protection from ordinary competition and nothing else. Richmond Bros, Inc., supra, 357 Mass. at 111.
It also cannot be overlooked, particularly from the point of view of the claims for interference with advantageous contractual or business relationships between Oceanair and J. Baker, that there must be proof that such relationships existed. United Truck Leasing Corp., supra, 406 Mass. at 812. Here, with J. Baker, a client or customer at-will with no contractual obligations to Oceanair, and with the evidence of J. Baker’s dissatisfaction with Oceanair’s service, it cannot be ruled that the proof is there. Nor was CHP’s or Katzman’s actions done “improperly.” Id. at 816, n.8.
Still further, with particular reference to the G.L.c. 93A claims — Counts V and VII — the law is clear that violation of a non-compete agreement by a former employee falls outside the scope of that statute, regardless of whether the alleged violation occurs during or after the employment relationship. Informix, Inc. v. Rennell, 41 Mass.App.Ct. 161, 162-63 (1996). See also Manning v. Zuckerman, 388 Mass. 8, 14 (1983). This point was recognized on November 13, 2001, when this Court allowed Katzman’s motion to dismiss Count V. See Memorandum and Order, November 13, 2001, p.3.
This Court agrees with Judge Gants that “[i]f the actual willful breach of a non-compete agreement by an employee is not actionable under c. 93A because the claim arose from the employment relationship, then the conduct of a third party to induce such a breach must also not be actionable because this claim, too, arose from the employment relationship.” Intertek Testing Services NA, Inc. v. Curtiss-Strauss LLC, 2000 Mass.Super. LEXIS 354. Consequently, there is yet another reason why the claim against CHP in Count VII, seeking C. 93A relief must fail.
ORDER FOR JUDGMENT
For the foregoing reasons this Court orders that judgment be entered in favor of the defendants, dismissing all counts of the plaintiffs’ complaint.