Velis, J.
The question this case presents is whether a party, in this case James A. Davey (“Davey”), can protect his goodwill in a customer relationship with his customer, the Martin Brower Company (“Martin Brower”), in a given geographic area, namely two travel lanes, from one of its vendor transportation carriers, namely Shaffer Trucking (“Shaffer”), who may also have goodwill with the same customer in a different geographic area. This is an action brought on by the plaintiff (“Davey”), owner of Distribution Logistic Services (“DLS”), to redress the alleged loss to the business when the defendants, Shaffer Trucking and/or The Acklie Group allegedly breached the non-solicitation agreement. The defendant now moves for summary judgment on the grounds that: (1) a valid and binding contract was never formed; (2) the non-solicitation agreement is unenforceable; and (3) the alleged conduct did not breach the terms of any non-solicitation clause as a matter of law

BACKGROUND

In 1998, Davey started DLS, a freight brokerage company. DLS provides brokerage and related services to shippers, warehouses, trucking companies, distribution and logistics concerns. DLS arranges shipment with carriers that transport freight from one location to another and operates out of Oxford, Massachusetts.
The defendant Shaffer Trucking, Inc. is a transportation carrier that specializes in the transportation of refrigerated goods and products. The other named defendant, “The Acklie Group,” is not a legal entity, but refers to a joint marketing effort conducted by Shaffer and the Sunflower Carriers divisions (“Sunflower”) of Crete Carrier Corporation (“Crete”).[1] Crete Carrier is a diy-van Carrier, Shaffer Trucking and Sunflower Carriers are refrigerated carriers. These companies, among others, were and are owned by Mr. Duane Acklie. An affidavit of Paul H. Doller (“Doller”) dated April 4,2003 and filed in court on April 7, 2003 explains that Shaffer merged with Crete on January 1, 2003. As a result of the merger, Sunflower no longer exists. Prior to the merger Sunflower and Shaffer both utilized a network of 22 terminals throughout the United States.[2]
The dispute between the parties concerns the shipping business of the Martin Brower Company. Martin Brower is a distribution network located throughout the country and is a food distributor for McDonald’s Restaurants. In support of its opposition to this motion, DLS submitted the affidavit of Joseph Christopher (“Christopher”) who was employed as a manager by Martin Brower from 1984 to 2002. In that affidavit dated November 21,2002, Christopher states that Martin Brower has two separate and independent divisions. One division has the exclusive function to supply products to McDonald’s restaurants, for which Martin Brower maintains separate facilities and employees for that division. The affidavit further explains the other division of Martin Brower was the National Accounts Division, which was eventually sold to Prosource a division of Seagram’s at some tine prior to 1996. MBX Services, LLC (“MBX”) is a wholly owned subsidiary of Martin Brower.
Davey states that he had business dealings with Martin Brower as early as 1988, while he was employed with Ken’s Foods. In addition, Davey worked for Martin Brower full time from July 1996 to April 1997. Even when Davey started his own business, Martin Brower consistently called upon DLS to arrange truck transportation for goods going to their warehouses in Ayer, Massachusetts and Enfield, Connecticut on a spot quote basis. The defendant, however, clarifies that DLS only began doing business with the Martin Brower Company in 1998 when it obtained its ICC license. At that time, the defendant also points out, DLS did not handle specific travel lanes for Martin Brower.
In the middle of 1999, Martin Brower consolidated its procurement of truck transportation services by using only one broker in each traffic lane. In September or October of 1999, DLS solicited and became the sole provider to Martin Brower in two traffic lanes.[4]
*495 The first travel lane started in Chambersburg, Pennsylvania and ended in Enfield, Connecticut at a rate of $600 paid by DLS to Shaffer. The second travel lane started in Chambersburg, Pennsylvania and ended in Ayer, Massachusetts. For this travel lane, DLS paid Shaffer $650. In turn, DLS received $750 from Martin Brower for the first travel lane and between $825 to $850 for the second travel lane. A letter dated September 23, 1999 and submitted in support of the defendant’s summary judgment motion shows that Davey sought confirmation from Shaffer that it could handle approximately 40 loads per month from Chambersburg, Pennsylvania to Enfield, Connecticut and Ayer, Massachusetts. In that letter, Doller stated that Shaffer would be in a position to handle 100% of that traffic by November 1, 1999. From November 1999 until November 2000, DLS filled all of Martin Brower’s transportation needs in those two traffic lanes.[5] Davey testified at his deposition that there was no written contract between DLS and Martin Brower. DLS used Shaffer frequently as the carrier in those two traffic lanes. As Davey described it at his deposition, Shaffer had the right of first refusal, and DLS would tender all Martin Brower loads to Shaffer, but if Shaffer could not accommodate the loads, DLS would broker with other carriers.
In May 2000, DLS sought to execute a written contract between it and Shaffer. DLS presented Mr. Doller of Shaffer with a standard form “Master Contract Carrier Agreement.” Mr. Doller submitted the proposed contract to Shaffer’s legal counsel, Richard Peterson for review. The parties do not dispute that DLS informed Doller that it wanted a signed contract from Shaffer or Shaffer would lose the business for the two travel lanes. Davey states in his affidavit that he was told Shaffer’s legal department was reviewing the document and that it would be returned in amended form. On July 19, 2000, Shaffer sent a document signed by Doller to DLS.
Shaffer claims it never received acknowledgment that the document had been accepted. In particular, it claims that it never received an executed copy of the Addendum to the Agreement for Transportation Services from DLS.
The Addendum to the Agreement for Transportation Services altered and modified paragraphs 2, 3, 5, 6, 8, and 9 to the Master Contract Carrier Agreement. The addendum deleted paragraph 8 in its entirety which had provided that:
If CARRIER accepts the load and moves the freight this will acknowledge that this new customer is a DISTRIBUTION LOGISTIC SERVICES customer. CARRIERhas (10) days after such “first load” moves to challenge, in writing, why the customer shall not be considered a DISTRIBUTION LOGISTIC SERVICE customer. In any case of challenge, DISTRIBUTION LOGISTIC SERVICES and CARRIER will agree in writing exactly how this customer will be handled.
Paragraph 9 under the addendum read:
CARRIER agrees to support and protect BROKER’S efforts in performance of this agreement by refraining from any contact or solicitation of DISTRIBUTION LOGISTIC SERVICES customers who were first serviced under this Agreement. During the term of agreement and for a period of six (6) months from the time of the termination of this agreement, CARRIER shall not, directly or indirectly, solicit or do business of a transportation or warehousing nature with any of BROKER’S customers who were first serviced by CARRIER as a result of this agreement unless otherwise agreed to in writing.
Davey states that he accepted these changes and continued to use DLS to handle Martin Brower shipments.
Shaffer asserts that it has been transporting freight for Martin Brower since 1996. In support of this motion for summary judgment, Shaffer produced contracts between it and Martin Brower dated September 15, 1997,[6] August 24, 1999[7] and May 12, 2000.[8]
The defendant states that in April or May of 2000 it was informed by Bob Smith of MBX that MBX was taking control of all Martin Brower’s business lanes. There is no affidavit from Bob Smith in the record, nor is there an internal memorandum or business correspondence from Martin Brower or MBX memoralizing this business policy shift. Shortly thereafter, Shaffer states that it was approached by MBX about servicing those traffic lanes.
According to the defendant, Martin Brower’s relationship with DLS for the two traffic lanes ended. The Parties agree that since November or December of 2000 Shaffer has handled the two traffic lanes for Martin Brower. Davey states that since November 7, 2000, the defendants have been contracting directly with Martin Brower to handle the shipments that it had previously handled through DLS.
In February 2002, Martin Brower closed its Ayer, Massachusetts facility, the traffic lanes to Ayer no longer exist.

DISCUSSION

Massachusetts Rules of Civil Procedure 56(c) allows the Court to enter summary judgment only where there are no genuine issues of material fact, and the moving party is entitled to a judgment as a matter of law. Ng Brothers Construction, Inc. v. Cranney, 436 Mass. 638, 643-44 (2002), citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711, (1991). Mass.R.Civ.P. 56(c). In determining whether there are genuine issues of material fact, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). All facts and inferen *496 ces are taken in the light most favorable to the non-moving party. See Harrison v. NetCentric, 433 Mass. 465 (2001).
The defendant argues that summary judgment should enter in its favor because the plaintiff did not return the Master Contract Carrier Agreement with addendums acknowledging the new terms, and therefore, there is no valid and binding non-solicitation agreement between the parties. “Offers commonly invite acceptance in any reasonable manner.” Restatement (Second) Contracts §50 cmt. (a) (1979). The parties do not dispute that Davey or DLS insisted that Shaffer return a signed contract to DLS and that in July of 2000 counsel for Shaffer did so. The parties also do not dispute that Shaffer continued to ship Martin Brower freight brokered by DLS in the two travel lanes at least until November of 2000. Thus, Davey has asserted sufficient facts on the issue of acceptance by performance. See Ivas v. Reardon, 265 Mass. 367, 370-70 (stating whether offer accepted before its withdrawal question of fact for the jury to decide). See also Thomas v. Massachusetts Bay Transportation Authority, 39 Mass.App.Ct. 537, 538 (finding material questions of fact on the issue of acceptance). Cf. Unisys Finance Corporation v. The Allan R, Hackel Organization, Inc., 42 Mass.App.Ct. 275, 282 (1997) (holding whether defendant revoked certificate of acceptance is question of fact). Since DLS continued to use Shaffer until November 2000 it would be reasonable for a jury to find that DLS accepted the new terms in Shaffer’s counteroffer.
The second issue raised by this motion for summary judgment is the protection afforded by a non-solicitation agreement between a freight broker and its vendor carrier. In the employer-employee context “(i]t is well settled in this Commonwealth that a covenant restricting trade or competition will be enforced if it is reasonably limited in time and space, and is consonant with the public interest.” Analogic Corp. v. Data Translation, Inc., 371 Mass. 643, 647 (1976). “If the covenant is too broad in time, in space or any other respect, it will be enforced only to the extent that is reasonable . . .” All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). “[The] enforcement of a restrictive covenant of this type requires a weighing of all the circumstances . . .” Id. at 779. “Any restraint must be consistent with the protection of the good will of the employer. The former employee must be in a position where he can harm that good will, perhaps . . . because the former employee’s close association with the employer’s customers may cause those customers to associate the former employee, and not the employer, with the products of the type sold to the customer through the efforts of the former employee. All Stainless, Inc., 364 Mass, at 779-80. ’’Good will generally applies to customer relationships." Kroeger v. Stop & Shop Companies, Inc., 13 Mass.App.Ct. 310, 316 (1982). These standards of restrictive covenants are applied more liberally outside of the employer, employee context. See e.g. Alexander & Alexander v. Danahy, 21 Mass.App.Ct. 488, 496 (1986).
Davey states in his affidavit that he had a business relationship with the Martin Brower Company dating back to 1988, that he sought to be and obtained the position of sole provider for two of Martin Brower’s traffic lanes in 1999, and provided service to Martin Brower until November 2000. Further, Davey stated at his February 19, 2002 deposition that he did not know until October of 2000 that Martin Brower planned to sever its relationship with outside brokers. Davey has presented sufficient facts from which to conclude that he sought to protect his goodwill in the business relationship he had with Martin Brower. Under the provision, DLS has a six-month safe harbor period after termination of the agreement, during which Shaffer could not solicit DLS customers for whom it may have carried freight under the agreement. Marine Contractors Co., Inc. v. Hurley, 356 Mass. 280, 289-90 (1974) (finding three-year period not excessive or unreasonable).
The defendant also argues that under the terms of that particular provision, Davey cannot prove that Martin Brower was a DLS customer first serviced under the contract. How a customer became a DLS customer was set out in paragraph 8, which defendant deleted by the addendum. Thus, the Court is left to interpret “customers who were first serviced under this agreement.” “In the absence of an express definition, the interpretation of contract language presents a question of law for the court...” Vergato v. Commercial Union Insurance Company, 50 Mass.App.Ct 824, 826 (2002). “The terms stated by parties to a contract will be taken in their plain and ordinary sense unless otherwise indicated by the contract.” Rogaris v. Albert 431 Mass. 833, 834 (2000). “[The] object of a court is to construe a contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” Vergato v. Commercial Union Ins. Co., 50 Mass.App.Ct 824 (2001). The Court interprets the words “customer who was first serviced under this Agreement” to give effect to the non-solicitation clause in this broker and shipper context. In other words, Martin Brower will be a customer first serviced by DLS, if at the time DLS and Shaffer entered into the contract, DLS had brokered for Martin Brower in the two travel lanes with sufficient predictability and regularity and at the exclusion of other logistic or shipping companies to warrant protection of DLS’s accumulated good will which would insulate it from a competitor with inside knowledge for six months.
The defendant’s argument raises fact issues that require further development since the parties dispute when and how their initial business relationship with Martin Brower arose. For example, Shaffer claims to have carried freight for Martin Brower prior to entering *497 the alleged contract with DLS. The documents submitted in support of this fact are shipping records from Crete showing Sunflower made five deliveries for Martin Brower in 1999. In addition, the defendant submitted a report of invoices sent by Shaffer to Martin Brower or MBX from January 1996 through January 10, 2001[9] and three contracts between Martin Brower and Shaffer dated September 15, 1997, August 24, 1999 and May 16, 2000. The Court notes that none of the contracts, on their faces, appear to be for the two travel lanes in question. Davey countered these documents by submitting an affidavit of Joseph Christopher indicating that Martin Brower’s business is separated into the National Accounts division and the McDonald’s division. Davey argues that Shaffer serviced Martin Brower primarily with the National Accounts division, while the lost business in this case is from the McDonald’s division. Davey suggests that these divisions are sufficiently distinct such that shipping business with one division did not amount to a customer relationship with the other. Given these submissions, the Court cannot determine that Shaffer did not violate the non-solicitatión agreement as a matter of law. It is not the duty of this Court “to conduct a trial by affidavits or other supporting materials, but to determine whether there is a substantial issue of fact." Noble v. Goodyear Tire & Rubber Co., 34 Mass.App.Ct 397, 402 (1993). Whether Martin Brower was first serviced by DLS requires the resolution of a number of underlying material fact issues including: the dates upon which service to Martin Brower by DLS and Shaffer, respectively, began; the weight and value to give to the existence of the two divisions within Martin Brower; the extent Sunflower was identified with Shaffer in order to weigh Sunflower’s service to Martin Brower in Shaffer’s favor.
The defendant also argues that it did not solicit Martin Brower, but that Martin Brower sought it out as a result of a policy change within Martin Brower. Therefore it argues that it did not breach the non-solicitation agreement. In support of its position it cites to Oceanair, Inc. v. Katzman, Civil No. 003343BLS (Mass.Super. January 22, 2002) (van Gestel, J.) (14 Mass. L. Rptr. 414). This argument fails for two reasons. First the agreement itself prohibits soliciting directly or indirectly or doing business of a transportation nature with DLS’s customers. It made no difference under the agreement who solicited whom. Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 499 (1986) (“As a practical matter, the difference between accepting .. . business, on the one hand, and indirectly soliciting on the other, may be more metaphysical than real”). Second, the Court in Oceanair sat as a fact-finder in a jury-waived trial, and made its determination that there was no breach when the employee restricted by a non-solicitation agreement provided information to the customer of the former employer based on the facts of the case. Here, the Court cannot make the same factual determinations as a matter of law.
Summary judgment must be denied.

ORDER

For the reasons set out above, the Court DENIES summary judgment.

The addendum which is discussed later in the text refers to ‘The Acklie Group/Temperature Control Companies.” The letterhead on which the September 23, 1999 letter from Shaffer to Davey at DLS has the logos of affiliated companies HTL, Crete, Sunflower and Crete Intermodal Service in the footer.

Attached to Doller’s April 4, 2003 affidavit is a document that was prepared from the records maintained by Crete showing shipments carried by Sunflower for the Martin Brower Company. However, Sunflower did not ship on the travel lanes in question. In fact the document shows only three shipments delivered to Enfield, Connecticut and two delivered to Ayer, Massachusetts, but those shipments originated either in White Bear Lake, Minnesota or Louisville, Kentucky.

The defendant submitted into the record a letter dated July 14, 1999 sent via facsimile from Paul Doller to Davey in response to a letter sent by Davey on July 9. This July 14 letter contains pricing information for travel lanes, in particular Chambersburg, PA to Enfield, CT and Ayer, MA.

Frank Islin in his affidavit dated January 2, 2001 states that Davey was told that Martin Brower had made a strategic decision to sever its relationships with outside brokers in conjunction with discussions between him and Davey regarding the sale of DLS. However, Davey at his February 19, 2002 deposition stated Islin offered him a position as a national sales manager, and that he never put DLS up for sale, but rather, assumed that if he took the position Martin Brower would buy DLS’s account as well. Davey, in his deposition states that he first spoke with Islin regarding the severance of the relationship with DLS in October of 2000. Islin stated in his affidavit that Martin Brower’s relationship with DLS ended in December of 2000.

Martin Brower and Shaffer executed this contract. Appendix A which sets out the specific travel lanes and rates covered under this agreement is not in the record before the Court.

Martin Brower and Shaffer executed this contract for the travel lane between Cheswick, Pennsylvania and Enfield, Connecticut at a rate of $825, Cheswick, Pennsylvania and Ayer, Massachusetts at a rate of $950, and Chambersburg, Pennsylvania to Carnegie, Pennsylvania at a rate of $550.

Martin Brower and Sunflower Carriers executed this contract. Appendix A which sets out the specific travel lanes and rates covered under this agreement is not in the record before the Court.

This report identifies for each invoice: the origination city and state and the destination city and state. The report shows no freight transported on the two travel lanes between Chambersberg, Pennsylvania and Ayer, Massachusetts or Enfield, Connecticut until November of 2000.